The next case this morning is People of the State of Illinois v. Christian Goeden. When you're ready, please proceed. May it please the court, counsel, my name is Barbara Goeden. I represent the defendant, Christian Goeden, no relation. With regard to his appeal of a denial of motion to transfer to a non-secure setting, discharge, or continued release. This is a consolidation of the denial of two of his petitions. As a preliminary matter, because of Harrison, this court does have jurisdiction to hear this case, even though this is a post-Not Guilty by Resentment and Sanity case, and the state does not contest jurisdiction. Basically, my client was found not guilty by Resentment and Sanity and was involuntarily committed with a 2068 theme date. Under Illinois law, you're detained as long as you're subject to involuntary admission and need inpatient services. Basically, you're committed as long as you still remain dangerous and mentally ill, and I'll explain that later. After the petition, the resident, or the quittee, I'll say the defendant, has the right every six months to petition for outpatient services, discharge, or release. The objective of this is so that the quittees aren't indefinitely institutionalized. The court in these hearings, they have to hear the hearing within, I believe, 120 days, so it's a pretty quick process. They have a right to put conditions, to put a non-forensic discharge or release to the community. With the conditional release, it's a super-duper probation. It's two paragraphs long of what the court can condition the person to do. It can force them to take medication, stay in a group home, avoid contact with other people. The state can then, at that time, petition if they don't comply with that for recommitment in a secure setting. The state will argue that this standard of review should be manifest weight of evidence. We would argue that it's de novo review because the state court, in reviewing these two petitions, did not consider whether he's currently dangerous. That's an issue that does not comply with both the Constitution and Illinois law. Even if this court decides this matter on manifest weight of evidence, because in the trial court's testimony in both hearings, they did not consider whether he's currently dangerous, there was no direct evidence from the state on that. We feel that the judge's decision was not based on the evidence. I'll just shortly summarize this. Under the U.S. Constitution, confinement of a non-dangerous person is unconstitutional. Due process requires release if the person is still harmless but mentally ill. You can still have the mental illness. He doesn't have to prove that he's no longer mentally ill. It just has to prove that he's no longer dangerous. Illinois law reflects that due process requirement. Of course, the court's considered the past conduct, the original crime, but the court must also look at the current condition and the current behavior of the person, and that's to avoid indefinite institutionalization because basically we're not punishing the person. We're making sure that that person's no longer dangerous both for themselves and for society. So the past bad acts aren't really an automatic bar to a discharge, and the courts can affirm the denial of the petitions when the person's still dangerous, still violent in the hospital. And basically the possibility of statements saying that the person may not comply with medication in the future is not alone sufficient to deny these petitions for discharge. And the defendant can't guarantee, the defendant's attorney does not have the burden to say in the future they'll never be in harm because that's just a basically unjust burden. And basically the state doesn't contest this, too, that confinement of a non-dangerous person in a secure setting violates public policy because of limited resources. We have more and more limited beds. We should use them for those who are actively dangerous.  I know the court would be reluctant to totally reverse and discharge the person. We probably would appreciate if this court would remand this case with the correct interpretation of law saying that the court must consider whether he's currently dangerous or not, and that's in reflection of the due process in Illinois law. Here at the two hearings, the testifying psychiatrist at the second one said that he was not a danger to himself or others. The defense attorney, the attorney for my client said, is he currently dangerous? And she affirmed that he's not dangerous to himself or others in the current treatment setting. And in the 2009 hearing, there was no testimony about current dangerousness, whether he's a danger to himself or others. So in both hearings, the second hearing, the doctor testified that he's currently not dangerous in his current treatment setting. The first case, they didn't even mention the issue of whether he's currently dangerous or not. And in this case, while hospitalized, he was never, and I put in the brief longer than normal fact summaries. There were eight or nine reports of his. In none of those reports did they say that he was ever physically aggressive. There was no restraints, occlusion, or emergency meds, no incidents of physical violence. In the first hearing, they said, well, this petition should be denied because he's not sharing television privileges, and he's not allowing the badge, there was an identification badge, and he was not allowing them to swipe it every half hour, which is because it was a human rights authority decision that their DHS is not doing that anymore. So, and in the second hearing in 2010, Dr. Mahmoud said that basically, you know, this petition should be denied because he's socially isolated and his room is untied. Well, you know, that's not saying that he's currently dangerous, but when she directly answered the question that he's not dangerous. And in the second hearing, the judge acknowledged that my client was in a catch-22 situation, that basically the doctor said, well, he can't be discharged unless he increases his social skills, but he can't increase his social skills because he's in the hospital. So, you know, and the judge himself acknowledged it, and I don't think he looked at the alternatives. I think perhaps, and I'm not reading the mind of the trial judge, that he thought it was all or nothing, that there's many different shades of, you know, he could have gone to a group home or been in a non-secure hospitalization, you know, where he can progress outside to the community or have interactions to develop his social skills. Is there any argument to the trial court about those lesser alternatives? To be honest, no. I mean, he petitioned. Well, I guess my question is, I mean, did the defendant, through his counsel, or whoever presented his an all-or-nothing proposition? He didn't argue that, but his petition says to a non-secure setting, and he acknowledged he's willing to go to a group home. He directly testified that he was willing to comply with anything that the trial court said to do medication. Over the series of hearings in the trial court, the impression that the orders gave me was, you're progressing, but you aren't there yet. Is that a fair assessment of the progression of the court's determinations? Yeah, I think so, but they didn't really consider the issue of whether he's currently dangerous. You know, and actually there was direct testimony of the psychiatrist that currently in his current setting was not dangerous, which is kind of ignoring the whole thing. Does that really tell us anything about what to do? He's not dangerous as long as he stays in Alton State Hospital. That certainly doesn't tell us it's okay to take him out of Alton State Hospital. But the doctor never testified that if he was discharged, he would be. That he would be dangerous. I mean, in the report, there's a factor of risk factors for future conduct, and they place his last, you know, the crime and his social isolation, but they don't. So, in effect, there's no opinion on what would occur if he was taken out of a secure setting. Right. I mean, to be honest, the second one, the second hearing, there was some discussion, if I remember correctly, that he would probably become more social isolated and maybe revert back to that. But, you know, that could have been addressed through force. You know, like, I guess I have more experience with this where, you know, they gradually have to report every day. If they don't take the medication, the state can file a petition right away. You know, it's very, you know, authoritarian. You know, it's almost like probation kind of, but even more, you know. And really, it's interesting, the second hearing, the doctor says, well, you know, he may be entitled to more privileges, but I have to abide what DHS says per employee. So it's like it's not really even the court making the determination. It's what, or even the doctor, it's what DHS, the state agency, saying that everyone has to fit this cookie-cutter thing, progression, not reflecting on the person's current conduct or his compliance. And, you know, what's kind of disturbed me most about this case, there's two issues, that they really didn't consider his current dangerousness or what he would, if they even asked whether he would be dangerous if discharged right now. And the second part was the acceptance that the DHS think, well, you have to go through this graduate statement plan without really any judicial overview. I mean, I think this is a check for the state to commit someone or institutionalize someone for a wrong thing who may be, who may get, well, you know, who may be no longer dangerous, you know, still mentally ill, but no longer dangerous. And, you know, they could have, as I stated before, they could have put him in a non-secure setting like a group home or a civil unit or, you know, super probation, but that wasn't even considered, so. Okay. Thank you. Mr. Daley. Good morning, Your Honor. It's a pleasure to be in court, counsel. As usual, counsel gives an excellent overview of the legal background for these types of cases. This is a consolidation of two appeals. There hasn't really been a lot of challenge with regards to the factual background of the first appeal, which is this Court's 10-23. That was the first petition the defendant filed. At that point, the defendant was not taking medication, not refusing medication, refusing treatment, et cetera. What we have here, obviously, is I won't deny that the defendant has progressed from Appeal 1 to Appeal 2. I also can't really challenge counsel's argument that it would have been especially helpful if Dr. Mahmoud had had a more direct question with regards to dangerousness. I do challenge the argument that she testified that he was not, no longer posed a danger. I think within the broader context of he should be in a less secure or non-secure facility. That said, I want to back up a little bit, and I'm going to ask this Court to kind of take a broader view of the evidence in this case. If we look at just the hearing itself, I think it really has to be read in context with the predicate facts that led up to this point. The defendant was found not guilty by reason of insanity. If you look at the reports that are prepared in preparation to assess the defendant's fitness and his sanity at the time of the offense, there's certainly what I call behavioral markers that are, I think, probative as we get further along and look at what happened at the hearing and the defendant's testimony. In this case, at his petition for discharge for a less secure facility, he exhibited what Dr. Caneo described as poor hygiene. His room was cluttered and in disarray. He was acting in a very isolated manner and had essentially walled himself off in his room to the exclusion of contact with the outside world. He had voiced, he was actively schizophrenic and was voicing paranoid delusions, if you will, that his father was making plans to kill him. He had kept a knife in his room under his bed in case his father attacked him. He thought his father was feeding rat poison, things of that nature. And these are all part of what Dr. Caneo had sort of pieced together as evidence of an active psychosis. He was still really kind of at that point the first time that he filed his petition for discharge. Now, I want to start by looking at the defendant's testimony. I think you have to look at the defendant's testimony along with Dr. Mahmood's testimony. And I do think that that's imperative to do so because by statute, the defendant is the one who bears the burden here of going forward and convincing the court that that transfer to a less secure facility is appropriate. In that regard, I would add sort of parenthetically that I also agree with counsel that in the event this court disagrees with the state's position here, that a remand to the circuit court is necessary, I would say, for further proceedings to make that assessment of what type of treatment facility is appropriate. Based upon an understanding of the defendant's current dangerousness. Yes? As far as the burden of proof, though, the state doesn't have to prove he's dangerous. He has to prove he's not dangerous. Correct. That's correct. And in that sense, I do focus somewhat on the defendant's testimony here. I think that we could gather from his testimony, I think that, well, number one, he admitted that he was in a position where he was being expected to progress through certain steps that were established. They're part of sort of the comprehensive treatment plan to get further privileges. And within his treatment setting, I don't really rely on that too heavily. I do think it's part of the broader picture that has to be considered. Because, of course, this was the recommendation of the treatment team, if you will, about what he needed to do to satisfy their criteria to move to a less secure facility. But I do want to look at his testimony. Because he was asked about his father. And he made some interesting statements. He said that he only had his alleged, and these are the defendant's words I'm using here, paranoid ideations were in relation to what they, and they I presume only meaning either the doctors or the courts, would claim about how he was with his father. They didn't live with his father, they being the people making this assessment of him, but he knew that none of that had to do with his paranoid ideation. Now, one of the factors that courts have to take into consideration is the defendant's ability to assess their own mental illness at this point. Clearly, he's articulating words that are really hard to characterize as anything other than a denial that he was ever suffering from schizophrenic behavior. And I think that when we look at a case and we have to decide whether the judge's ruling is against the manifest way of the evidence, certainly what the judge says specifically is an important factor, but I do think that the whole record as a whole, as we look at the ultimate result that the court reached, and this court can obviously look at anything that's in the record as a justification for the court's ultimate decision, is important. And I think the defendant's own words here are rather distressing with regards to identifying the type of progress that he's been making. He's made some progress. He's been on his drug, Ubilify, now for about two months at the time of this hearing. The doctor indicated, I think, somewhat inconsistently that his thought process was getting better, but I also want to segue from that to pointing out that it had been noted that the defendant's room was very messy, he had sort of a hygiene issue going on there, and he would typically wall himself off or isolate himself with the group. The defendant rationalized or justified that however he wanted to characterize it by saying that he didn't feel he had the kind of commonality of personality with the people that were being treated. Yea or nay on that point, the point of the matter is that these are, to what I had said earlier, behavioral markers that are markedly similar to what Dr. Caneo had identified back at the beginning stages of this case when assessing his mental health. So those are, again, aspects that this court should take into consideration. There's been some discussion about is it really enough to say, well, he's not complying with Department of Human Services criteria. I do think that if they're the only thing to ever be there, I'm not sure that that would be enough. I don't really know if we have to get into that or not because I think that it's just part of the bigger picture about how they are saying, as Justice Goldner sort of alluded to earlier, he's getting better, he's not quite there yet. And I think that there's a lot in this record to justify that particular conclusion. Is it your reading of the record that he believes that in killing his father he was justified? I believe that he's saying that, well, I think he's saying that it wasn't motivated by some psychotic episode. To say it was justified, I don't think it's an unfair inference. He didn't come right out and say that directly. I won't say that he is actively psychotic like he was at the time. I'm not a doctor to make that diagnosis and that wasn't testified to here. I'm just pointing out that you have to look at the whole record and not just look at the tunnel vision one isolated part of the doctor's testimony or the defendant's testimony. But I think you have to compare that with what's going on. I think this court has that right and ability to do so. I do not agree with the argument that the doctor testified that he was not a danger to himself or others. Her testimony is that in his treatment at the present time, and this is the question posed by defense counsel, in his treatment at the present time, do you feel he's a danger to others or to himself? So it's really the defendant who sort of set up this category of dangerousness that isn't broadly to say that he's no longer dangerous. It's within that current treatment setting that he's no longer dangerous to himself or others. And I don't think that doctor obviously agreed with that. But all that really demonstrates in the long run is that his treatment is working. But it doesn't demonstrate that he has proven or qualified himself to move towards that step of having a less restrictive environment. That's really about everything I have, Your Honors. Counsel has done a good job of presenting her case. And I do ask, though, I think the one difference that we might have in opinion would both be the standard review, and I do believe it's clear and convincing evidence. This is not a strict legal question here. This court has to look at the facts because the defendant does bear the burden and does have the burden to come forward with the facts. And I think all the facts are really relevant to making an assessment of the correctness of the trial court's ruling. And, of course, I would go a little bit further than counsel in the sense that, as I said, I think that you have to start to look at what were the factors that led to his initial NGRI. And I think the defendant's own words ought to give this court significant concern that he's really at that point. Your Honors, do you have any other questions for me? I appreciate your time as always. Thank you. Thank you. Any rebuttal? Just a short clarification. In the, especially toward the later, all the psychiatric reports and Dr. Mahmoud's testimony stated that my client had reality-based conversations. She didn't mention that he was psychotic, that in general that he was, you know, in the moment and in the time. And there was also testimony presented that he actually was attacked at Alton by a fellow patient, and he didn't react in any self-defense or anything. He called the police and the staff, you know. So I think, you know, the issue is, you know, the state would like this reviewed by, you know, manifest weight of evidence. But the state didn't present any clear evidence about future conduct, about future dangerousness, or whether he's currently dangerous. The only evidence, especially in the second hearing, was that in his current treatment setting, he was not dangerous. So that I would like to point out. Any other questions? No. Thanks very much for your briefs and arguments this morning, and we'll provide you with a decision.